ADOPTION OF KIMBERLY
(and a companion case[1] ).

Hampden. November 4, 1992. - March 9, 1993.

Present: WILKINS, NOLAN, LYNCH, & GREANEY, JJ.

*Adoption*, Dispensing with parent's consent. *Parent and Child*, Dispensing
    with parent's consent to adoption. *Minor*, Adoption. *Evidence*, Child
    custody proceeding, Sexual conduct, Hearsay, Admitted without objec-
    tion, Questioning of witness by judge. *Due Process of Law*, Adoption.
    *Constitutional Law*, Confrontation of witnesses.

In a proceeding under G. L. c. 210, § 3, to dispense with parental consent
    to the adoption of two children, the judge's findings that the mother
    was currently unfit to care for the children and that the plan of the
    Department of Social Services calling for the paternal grandparents to
    adopt the children was in the best interests of the children were sup-
    ported by clear and convincing evidence and were not clearly erroneous.
    [528-531]
In a proceeding under G. L. c. 210, § 3, to dispense with parental consent
    to the adoption of two children, clear and convincing evidence sup-
    ported the judge's finding that the two children had been sexually
    abused. [531-532]
In a proceeding under G. L. c. 210, § 3, to dispense with parental consent
    to the adoption of two children, the mother, by her failure to object,
    waived her objections to the judge's admission in evidence of six out-of-
    court statements of one of the children relating sexual abuse by her
    father under the provisions of G. L. c. 233, § 82; moreover, the state-
    ments were merely cumulative of other, independent evidence of sexual
    abuse of both children. [532-535]
In a proceeding under G. L. c. 210, § 3, to dispense with parental consent
    to the adoption of two children, the testimony of one of the children
    was properly admitted under procedures agreed to by the parent's coun-
    sel. [535-537]
The services and treatment provided to a family by the Department of
    Social Services were not "so arbitrary and irrational as to warrant a

---

[1]Adoption of Joyce.

dismissal" of proceedings under G. L. c. 210, § 3, to dispense with parental consent to the adoption of two minor children. [537-538]

Error in the admission of a report prepared under G. L. c. 119, § 24, in proceedings under G. L. c. 210, § 3, was harmless, where there was ample evidence aside from the report to support the judge's conclusions. [538-539]

PETITIONS filed in the Hampden Division of the Probate and Family Court Department on October 5, 1989.

The cases were heard by *David G. Sacks*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Robin L. Stolk* for the mother.

*Elizabeth A. Sickelco* for the minors.

*David B. Perry* for Department of Social Services.

LYNCH, J. The mother of two minor children appeals from judgments of the Probate and Family Court, dispensing with the need for her consent to the adoption of her daughters, Kimberly and Joyce, pursuant to G. L. c. 210, § 3 (1990 ed.). She argues that (1) the judge's findings regarding current parental unfitness and the best interests of the children were not supported by clear and convincing evidence; (2) the failure of the Department of Social Services (department) to provide timely and appropriate services to prevent the dissolution of the family requires reversal of the judge's decision to terminate parental rights; and (3) certain evidentiary rulings constituted reversible error. We transferred the case here on our own motion, and we now affirm.

The children at issue, Kimberly and Joyce, have the same natural mother but different fathers.[2] The mother also has another child, Lucy, by the father of Joyce (to whom we shall refer as "Bob").[3] Since November 1, 1988, Kimberly and Joyce have lived with Kimberly's paternal grandparents

---

[2] At the time of this proceeding in December, 1991, Kimberly was seven years old and Joyce was six years old.

[3] At the time of the proceeding Lucy was two years old.

who are the prospective adoptive parents.[4] On January 24, 1989, a District Court judge adjudicated Kimberly and Joyce in need of care and protection pursuant to a petition filed by the department. See G. L. c. 119, § 24 (1990 ed.). On October 5, 1989, the department filed the instant petitions which, while not consolidated, were heard together. The children's natural fathers did not contest the petitions.

After a three-day trial, the judge found that both girls had been victims of sexual and emotional abuse and neglect and allowed the department's petitions. The judge's order allowed the children to be adopted by the grandparents and granted the mother visitation rights subject to certain conditions.[5]

1. The mother argues that the evidence relied on by the judge in concluding that she was currently unfit to parent the children was stale and, therefore, was not clear and convincing. She admits that the record supports the judge's findings as to her life-style up to the time that the children were removed from her care, but claims that she has since improved and currently has the ability to assume parental responsibility for the children. The mother also argues that the judge's conclusion that the best interests of the children are served by terminating parental rights is also not supported by clear and convincing evidence. Since parental fitness and the best interests of the child are interrelated inquiries, we address both arguments together. *Adoption of Carlos*, 413 Mass. 339, 348 (1992), citing *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 641 (1975).

In order to remove children permanently from a natural parent and to dispense with parental consent to adoption under G. L. c. 210, § 3, the judge must find, by clear and convincing evidence, that the parent is currently unfit to fur-

---

[4]Kimberly's paternal grandmother and the children's pediatrician filed reports pursuant to G. L. c. 119, § 51A (1990 ed.), with the department because of concerns about neglect and sexual abuse of the children in October, 1988. The department substantiated the reports and filed the care and protection petitions in November, 1988.

[5]See note 10, *infra*.

ther the welfare and best interests of the child. *Care & Protection of Martha*, 407 Mass. 319, 327 (1990), and cases cited. However, a judge can "rely upon prior patterns of ongoing, repeated, serious parental neglect, abuse, and misconduct in determining current unfitness." *Adoption of Diane*, 400 Mass. 196, 204 (1987). The judge's findings must be left undisturbed absent a showing that they are clearly erroneous. *Care & Protection of Martha, supra.*

Many of the judge's findings concerned the mother's lifestyle prior to when Kimberly and Joyce were removed from her care in 1988.[6] The judge also made findings that the mother may have been improving her ability to care for the children.[7] However, the judge concluded that the mother was unfit to parent her children specifically due to "her continuing and problematic relationship with [Bob, the father of Joyce and Lucy]." The judge found that "[b]oth girls [Kimberly and Joyce] were sexually abused by [Bob] by direct and inappropriate physical contact. This is clear from the Court's own observations of [Kimberly], as well as from the testimony and exhibits. . . . One of the many results of this abuse is that both girls are in fear of being in [Bob's] presence, alone or with others, and even seeing possessions associated with [Bob] cause them great anxiety." On the testimony of the children's therapist, the judge also found that, "[u]nder no circumstances should [Joyce and Kimberly] be in the presence of [Bob], or in a place where he may leave his clothing or personal effects." Further, while the judge

---

[6]The judge found that, prior to their removal from the mother, the mother neglected the children's medical and nutritional needs, had a history of illicit drug use involving marihuana and cocaine, and on a number of occasions did not take antiseizure medication resulting in hospitalization. The judge also found that during this time the children were exposed to inappropriate partying, violence, drugs, alcohol, pornographic movies, and were sexually abused by Bob, the father of Joyce and Lucy.

[7]The judge found that the mother had consistently attended department therapy since it was set up in October, 1990, that she was currently addressing the issue of the children's sexual abuse with her therapist, and that "[t]here is a very good relationship between the mother and her daughters."

was unable to find that the mother lived with Bob at the time of the trial, he did find that Bob did not have a permanent address, worked near the mother's residence, visited her residence daily to visit his child Lucy, left many possessions there, and frequently showered, changed clothes, and ate there. In addition, on the basis of a psychological assessment, the judge found that the mother "placed her own needs to continue involvement with [Bob] before the needs of her children," that "the mother was very slow to acknowledge and deal with the impact of the sexual abuse," and that "[t]he mother has a history of having failed to protect these two minor children from abuse and neglect and in fact has contributed to some of what they have suffered."[8] Thus, the judge concluded, "[g]iven that on-going contact and relationship, there is no way that the girls could be returned to the mother's care as they would be continually at risk of contact with [Bob]."[9]

In regard to the children, the judge found that Kimberly "needs consistently stable care with a regular routine, warm, nurturing care where she feels loved and safe with no threat of danger." As to Joyce, the judge found that her "parenting needs are the same as those of [Kimberly] plus she needs a little more understanding for her regression: she needs tolerance and patience." The judge also found that both girls were suffering from posttraumatic stress disorder as a result of the sexual abuse, but that their behavior had improved

[8]A parent may be fit to raise one child and unfit to raise another. *Petition of Catholic Charitable Bureau of the Archdiocese of Boston, Inc., to Dispense with Consent to Adoption*, 395 Mass. 180, 185 n.6 (1985). *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 589 (1981). *Adoption of George*, 27 Mass. App. Ct. 265, 269 (1989). Thus, the mother's argument that, because she is currently capable of caring for Lucy she is also fit to parent Joyce and Kimberly, is without merit.

[9]The judge also stated, "While it is appropriate under the circumstances of this case for mother and children to maintain a relationship, the mother's history and lack of current fitness predict that she would fail to protect them from [Bob] in the future. Having the mother as their caretaker under these factual circumstances presents an unacceptable risk to these two young girls."

since living with the grandparents. Thus, the judge concluded that the department's proposed plans for the children, which called for the grandparents to adopt the children, were in the best interests of the children. The judge granted the mother visitation rights, but stated that the children should not be exposed in any way to Bob or his effects, and that the visits should be at the discretion of the grandparents.[10] Because of the evidence of Bob's abuse, the mother's continuing relationship with Bob, and the children's improvement since living with the grandparents, the judge's findings and disposition of these cases were not clearly erroneous.[11]

2. The mother next contends that the judge's finding that the children "were sexually abused by [Bob] by direct and inappropriate physical contact" was not supported by clear and convincing evidence. She also argues that the finding is clearly erroneous because it conflicts with a finding adopted

---

[10]Specifically, the judge stated that the proposed plans "call for the children to be adopted by . . . the paternal grandparents of [Kimberly] with whom the children have lived for the past three years. Each of these plans is in the best interests of the children and should be implemented. . . . [T]he minor children should have an on-going relationship with their mother. However, their best interests dictate that such visitation must be out of [Bob's] presence and that they not be exposed to any items of personal property belonging to him or which would tend to remind them of him. The visits cannot be at the mother's residence. As to the frequency and scheduling of the visits, that is to be left in the sound discretion of the legal caretakers of the children."

[11]In *Adoption of Carlos*, 413 Mass. 339, 351 (1992), the court held that the trial judge's denial of a department petition to dispense with parental consent to adoption was not clearly erroneous where the mother had made " 'significant progress' with respect to her critical area of parental unfitness, namely her denial that her child had been sexually abused." The court focused on the fact that the findings of the mother's progress were largely unchallenged, that the child was suffering from "internal conflict" due to the separation from his mother, and that the department had not proposed a fully developed adoption plan. The instant cases are different. Here, the judge found that "the mother was very slow to acknowledge and deal with the impact of the sexual abuse," and that even after admitting the abuse, she continued her relationship with the abuser. In addition, the department presented fully-developed adoption plans here to place the children with the grandparents, where the behaviors associated with their abuse have lessened.

by the judge that "[Bob] sexually abused [Kimberly] and may have also sexually abused [Joyce]."

We do not reach the mother's argument that the evidence of abuse must be shown by clear and convincing evidence because the ample evidence of abuse clearly met that standard. The mother testified that she believed Bob had abused both of her daughters. One expert testified that she had no question the sexual abuse had occurred. In a report admitted in evidence, another expert who evaluated the children stated that "these two girls give a very definite history of inappropriate sexual activity by [Bob]. This is given against a backdrop that is well defined by everyone as high risk given the substance abuse that is present in the home and the presence of x-rated movies." The grandmother testified that Joyce and Kimberly demonstrated inappropriate sexual activity at home with each other and with dolls. Another witness testified that the children demonstrated similar activity in therapy. This evidence provides a clear and convincing basis for the judge's finding that both girls were abused.[12] *Care & Protection of Martha, supra* at 327.

3. Pursuant to G. L. c. 233, § 82 (1990 ed.),[13] the department filed a motion to admit six out-of-court statements of Joyce at trial.[14] The mother opposed the motion. After a

---

[12]The judge made many findings. The adoption of a finding that does not necessarily contradict the remainder of the findings clearly constitutes harmless error.

[13]General Laws c. 233, § 82 (*a*) (1990 ed.), provides that out-of-court statements of a child under the age of ten describing any act of sexual contact, the circumstances under which it occurred, or which identify the perpetrator shall be admissible as substantive evidence in any civil proceeding in certain circumstances, provided the judge finds that the child is unavailable to testify as a witness and the child's statements were reliable.

[14]The following out-of-court statements (contained in the department's proposed findings of facts) were made by Joyce to her grandmother at bathtime:

> "a) On January 7, 1989, [Joyce] pointed to her vagina and said, 'This is where [Bob] hurt me.' . . .
>
> "b) On June 3, 1989, [Kimberly] said, 'Doesn't Gramps want to touch my vagina? [Bob] says it's ok.' [Joyce responded], 'Yeah, me too.' . . .

hearing, the judge found, as required by the statute, that Joyce was unavailable to testify and that her statements met the statute's requirement of reliability.[15] The statements were later admitted in evidence. The mother now argues that admission of the statements was error.

The mother did not object to the introduction of the statements at trial. However, she asserts that, when the judge at the preliminary hearing stated that having children testify was his last preference, her counsel "understandably, fell silent." See *Adoption of Seth*, 29 Mass. App. Ct. 343, 350 (1990). She argues that her counsel's statement at the preliminary hearing, that he preferred that the children testify, should be interpreted as a continuing objection to the admission of Joyce's statements at trial. We disagree. A quick review of the record shows that the judge was not inappropriately pressuring counsel at the hearing or influencing the trial.[16] See *Adoption of Seth, supra* at 351. Moreover, the

---

"c) On May 3, 1990, [Joyce] said, 'Mommy has to stop letting [Bob] do those things.' . . .

"d) On January 9, 1991, [Kimberly] said, '[Bob] used to touch me on my vagina when he gave us a bath.' [Joyce] said, 'Me too.' . . .

"e) On October 11, 1991, [Joyce] said, '[Bob] hurt me in the vagina.' . . .

"f) On October 16, 1991, [Joyce] said, '[Bob] didn't use a towel on me in my vagina.' . . ."

[15]Specifically, the judge found that, if Joyce testified, "she would suffer regression in a number of specific behaviors including nightmares, behaving less than age appropriate, urinating in her clothing, . . . disobedience, difficulty in concentrating at preschool, and an inability to relate to other individuals as persons rather than as things."

The judge also stated: "[S]he repeated the same allegations over a period of time ranging from early 1989 until as recent as October 16, 1991. The content is very specific. The circumstances are with her grandmother during bathtime, which is a comfortable and intimate time in that household. This is a further indicator of the reliability for the statements. While the child is too young perhaps to appreciate specifically the consequences of this statement, I do find based on all the circumstances that she was sincere when she made the statements."

[16] THE JUDGE: "Let me ask [counsel for the mother] what is your position relative to [Kimberly] to there being an unorthodox method of receiving her testimony not in your client's presence? And based on what the witness said, not in counsel's presence at all."

COUNSEL FOR THE MOTHER: "I — it's difficult for me to make a statement without talking to my client about that particular issue. I

judge gave counsel every opportunity not only to object at trial, but to argue that the department had not even offered the statements as part of its case.[17] Counsel, however, failed to raise an objection. The consequence of such a failure to

---

think that, without my client's presence, it's feasible. I'd feel uncomfortable with not knowing at all what is said to the Court. I'm uncomfortable with myself not being present."

THE JUDGE: "What about if it were taped and the tape were made available to counsel?"

COUNSEL FOR THE MOTHER: "And if so, it would be a statement as opposed to any questioning going on. I guess my point is that, if I were to ask your Honor, would you cover these two or three areas or something of that nature, I'd probably feel comfortable with that."

THE JUDGE: "Well, certainly, if I were to do it in that manner, I would have no difficulty in receiving proposed questions beforehand, but not having all counsel present to say to me, 'Please ask her,' in her presence, and that does defeat the purpose of —"

COUNSEL FOR THE MOTHER: "No, I —"

THE JUDGE: "Why don't you think on that[?]"

COUNSEL FOR THE MOTHER: "This is, of course, I'm assuming the Court finds unavailability, etc., because my first preference is that, you know, they could testify. And I —"

THE JUDGE: "That's my last preference in any case in this court with a child."

COUNSEL FOR THE MOTHER: "I understand, your Honor. Obviously I'm coming from a different perspective. My understanding, and correct me if I'm wrong, I thought the children had expressed a desire to come, that they wanted to."

[17] THE JUDGE: "In terms of this witness's testimony in the preliminary hearing, and the offering of the statements, is everyone considering that those are in for direct purposes?"

COUNSEL FOR THE MOTHER: "Thank you. I meant to bring that up. I was going to ask the Court whether they are in or not. I was assuming that they were, but —"

COUNSEL FOR THE DEPARTMENT: "Yes."

THE JUDGE: "Is that all right with other counsel?"

COUNSEL FOR THE MOTHER: "That's fine."

THE JUDGE: "Those are considered to be in, and you have the right to cross examine?"

COUNSEL FOR THE MOTHER: "I did cross examine, so I think so."

THE JUDGE: "Well, I mean, you certainly have a right — I didn't take that to be the direct testimony, so I'm not — if you're saying it's okay that that's in as direct testimony, I still say that you may cross examine her further on those if you wish to, because I was not taking that as in."

COUNSEL FOR THE MOTHER: "Yes. I don't see the purpose of having her repeat it, your Honor."

COUNSEL FOR THE DEPARTMENT: "No, I don't — they're part of

object is to waive the objection to the testimony and the statements retained their "full probative force." *Freyermuth* v. *Lutfy*, 376 Mass. 612, 617 (1978). P.J. Liacos, Massachusetts Evidence 74 (5th ed. 1981).

Moreover, since the judge's finding that both girls were sexually abused was supported by evidence independent of Joyce's statements, there was no risk of reversible error in the admission of the statements. See discussion at Part 2, *supra.*

4. The judge determined that, based on the testimony of the children's therapist in the preliminary hearing, Kimberly was available to testify at trial. However, because the therapist testified that Kimberly would suffer emotional and psychological trauma if she were required to testify in the courtroom and in her mother's presence, the judge asked counsel whether the mother would be agreeable to a procedure whereby Kimberly would testify out of counsel's and her mother's presence. Following a colloquy with all parties, it was agreed that Kimberly would be questioned in chambers by the judge, that the questioning would be tape recorded, that Kimberly would be accompanied by a social worker who had not yet testified, that the judge would use questions

---

the evidence but not part of her direct testimony, those went in under a separate hearing. Statements —"

THE JUDGE: "A preliminary hearing."

COUNSEL FOR THE DEPARTMENT: "A preliminary hearing. But yeah, they're part of the evidence."

THE JUDGE: "Well, conceptionally, I was thinking of them in terms of having been dealt with separately, and I made a ruling that they could come in, and now you have a trial, it's a separate hearing."

COUNSEL FOR THE DEPARTMENT: "Yes. Well, are we agreed that they have come in?"

THE JUDGE: "Yes, he just agreed."

COUNSEL FOR THE MOTHER: "Yes. I don't see the point of making —"

COUNSEL FOR THE CHILDREN: "I consider them to be in."

THE JUDGE: "Thank you."

COUNSEL FOR THE MOTHER: "May I proceed?"

THE JUDGE: "You may, uninterrupted, until you get an objection."

based in part on proposed questions submitted by all counsel, and that the testimony would be recorded and later played back to the parties. The mother now argues that the judge erred in permitting Kimberly to testify in chambers outside her and her counsel's presence.[18]

a. Contrary to the mother's argument on appeal, the record indicates that the method of obtaining Kimberly's testimony was accomplished "by agreement" of all the parties.[19] The judge discussed the issue with the parties several times at both the preliminary hearing and at trial. The record indicates that the mother's counsel not only agreed to the hearing, but participated in fashioning the procedure.[20] Further, it is apparent that the judge did not force the mother's counsel to acquiesce to this procedure. The testimony was properly admitted.

b. The mother next contends that Kimberly's testimony in chambers deprived the mother of both her rights of confrontation and due process of law under art. 12 of the Massachusetts Declaration of Rights. However, she acknowledges that the right of confrontation in art. 12 is "not necessarily involved in a termination of parental rights case." See *Commonwealth* v. *McGruder*, 348 Mass. 712 (1965). Citing *Murphy* v. *Superintendent, Mass. Correctional Inst., Cedar Junction*, 396 Mass. 830 (1986), she then states that "[c]oncepts of due process of law expressed in [art. 12], however, are applicable to certain civil proceedings" and "[g]iven the significant nature of the parental rights affected in c. 210 proceedings, a measure of extra protection is required." This three-sentence argument does not assist us with meaningful citation of authority and cannot be said to rise to the level of

---

[18]Kimberly testified that on more than two occasions, Bob touched her between her legs, rubbed her in some places when neither he nor she was dressed and that, when she asked him to stop, he said, "no."

[19]The judge stated, "By agreement, there was an in camera hearing with the minor child, [Kimberly], in the presence of a social worker and questions posed by the Court were in part based upon proposed questions submitted by counsel."

[20]See notes 16 and 17, *supra.*

acceptable appellate argument under Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). *Larson* v. *Larson*, 30 Mass. App. Ct. 418, 428 (1991). Accordingly, this argument is deemed to be waived. *Commonwealth* v. *Johnson*, 413 Mass. 598, 603 n.6 (1992).

5. The mother next contends that the department failed to perform its duty to provide timely and appropriate services to prevent the dissolution of this family and, thus, that we should reverse the judge's decision. See G. L. c. 119, § 1 (1990 ed.); 110 Code Mass. Regs. § 1.01 (1986). We disagree. While there were findings that indicated one department social worker provided "marginal" services for a five-month period in 1990, the judge also found that those deficiencies were subsequently rectified by a department case manager who reestablished counseling for the mother and visitation with the children.[21] In addition, the findings indicate that the department properly did not return the children to the mother after the care and protection proceeding because she continued her relationship with the man who sexually abused her children. Thus, we hold that the department's treatment of the family was not "so arbitrary and irrational as to warrant a dismissal." *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 376 Mass. 252, 269 (1978).[22]

---

[21]The judge found that the department, after the five-month period during which treatment was marginal, rectified the deficiencies by: referring the mother to counseling, keeping in touch with her counselor, establishing at its own initiative visitation between the mother and children, and maintaining contact with the children's therapist, foster mother, and pediatricians.

In addition, the judge found that the mother many times did not participate in the provision of services. She abandoned the children for eight months. On her return, the department engaged her in counseling. Later, the department recommended that she change counsellors to a person who specialized in children's sexual abuse. The mother, however, refused to follow the recommendation even after her own therapist left the counseling center. Later, the department asked the mother to participate in a study to observe her interaction with the children, but she never responded.

[22]See also *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 376 Mass. 252, 268-269 (1978) ("Even if the judge had agreed that the agency should have used better judgment in working with

6. The mother's final contention concerns the admission of a report in the G. L. c. 210, § 3, proceedings that had been previously prepared by an investigator for the care and protection proceedings.[23] See G. L. c. 119, § 24.[24] The judge based only three out of his many findings on the report.[25] Furthermore, the three findings were not so inconsistent with the judge's other findings as to raise any question concerning his ultimate conclusion. Thus, any error could not prejudice the mother and would not provide a basis for reversal. See *Adoption of Frederick*, 405 Mass. 1, 6-7 (1989).

In sum, we hold that (1) the judge's findings regarding the mother's parental unfitness and the best interests of the chil-

---

the family, this would not have been dispositive of the issues before him. Under G. L. c. 210, § 3, it is the judge's task to determine [1] whether the parents are able to assume parental responsibility for their children, and [2] whether dispensing with parental consent to adoption served the best interests of the children").

[23]By the time of the G. L. c. 210, § 3, proceedings, the investigator was deceased.

[24]General Laws c. 119, § 24 (1990 ed.), states in pertinent part: "Upon the issuance of the precept and order of notice the court shall appoint a person qualified under section twenty-one, to make a report to the court under oath of an investigation into conditions affecting the child. Said report shall then be attached to the [care and protection] petition and be on a part of the record."

[25]The judge adopted the following findings that were prepared by the department and based on the investigator's report:

"48. Court Investigator . . . found that [the mother] 'projected responsibility (for 5 different residences since [Kimberly's] birth) on to other people and seemed to have minimal awareness of the impact on the children of such chronic instability. She indicated that she saw no problem with her care of the children or the lifestyle that she and [Bob] lived or how that might in any way impact on the children.'. . . She denied any knowledge [of] any inappropriate sexual activities.

"49. [Bob] acknowledged to [the court investigator] that 'boundaries in the home were quite loose' and 'that the children frequently ran around the house without underwear and that there were various people coming in and out. He talked about the availability of pornographic videotapes and that the children at times have seen him in the bathroom. . . . '

"50. [The paternal grandmother of Kimberly and foster mother] reported that [the mother] showed up for a visit after Thanksgiving of 1988 with [Bob], although [the grandmother] had specifically asked that he not visit because [Kimberly] had nightmares after his previous visits."

dren were supported by clear and convincing evidence, (2) the department's supervision of the case does not require reversal of the judge's decision, and (3) the judge's evidentiary rulings were not reversible error. Accordingly, we affirm the judgments allowing the department's petitions to dispense with the mother's consent to the adoption of Kimberly and Joyce.

*So ordered.*